The Governor shall appoint and fix the compensation of such number of deputy heads of administrative departments, except those of the Department of Auditor General and Treasury Department, as the Executive Board shall approve, who shall, in the absence of the head of such department, have the right to exercise all the powers and perform all the duties by law vested in and imposed upon the head of such department, except the power to appoint bureau or division chiefs, or other assistants or employees, and who may, at any time, exercise such of the powers and perform such of the duties of the head of his department as may be prescribed by the head of his department: Provided, however, That any such deputy shall not have the right to exercise any power or perform any duty which the Constitution of the Commonwealth of Pennsylvania requires the head of his department personally to exercise or perform.
Whenever there shall be a vacancy in the office of the head of any department, such deputy as the Governor shall designate in writing shall exercise the powers and perform the duties of the head of the department until the vacancy is filled.
Id. § 73 (emphasis added). Similarly, 71 P.S. § 762, enacted in 1917 and aptly titled *406 "Duty of person next in authority to act during vacancy or absence of incumbent" (a provision predating but closely related to the Administrative Code), states:
Whenever, by reason of the absence, incapacity, or inability of the head or chief of any of the departments of the State Government to perform the duties of his office, or whenever a vacancy in the office of the head or chief of any of the departments of the State Government occurs, the duties of the head or chief of such department shall be performed by the deputy, chief clerk, or other person next in authority, until such disability is removed or the vacancy filled.
Id. § 762. In 1980, the Commonwealth Attorneys Act made the AG's Office an independent agency and bestowed the power to appoint a First Deputy AG upon the AG, rather than the Governor. See 71 P.S. § 732-201. The Commonwealth Attorneys Act states:
(a) General provisions.-The Office of Attorney General shall be an independent department and shall be headed by the Attorney General. The Attorney General shall exercise such powers and perform such duties as are hereinafter set forth. As an independent administrative department the Office of Attorney General shall be subject to the same limitations contained in [the Administrative Code,] and all other acts as are applicable to the independent Department of Auditor General or State Treasury.
...
(c) Bureaus, divisions and personnel.-The Attorney General shall appoint and fix the compensation of a first deputy attorney general, a director of the Bureau of Consumer Protection and such other deputies, officers and employees who may, at any time, exercise such powers and perform such duties as may be prescribed by the Attorney General.
Id. In other words, the Commonwealth Attorneys Act removed the AG's Office from the Governor's control, but otherwise reaffirmed the application of the Administrative Code to the AG's Office, including as to the powers and duties of the First Deputy AG.
Defendants advance a number of arguments to explain why only the Wiretap Act's requirement of a written designation, and not any of the other state law provisions for dealing with the absence of the AG, should apply here. First, Defendants argue AG Kane was not absent when Deputy King signed the April 14 wiretap application. Although she was plainly physically out of the Commonwealth and on the way to or in another country (Haiti), they assert she was available by phone and was only briefly "out of pocket"-for the span of a few hours at the most. (Def. Montgomery's Suppl. Mem., ECF No. 363, at 2-3.) Although the statutes do not define "absent," Defendants argue, it could not be intended to mean so brief a time as to allow the First Deputy to take charge when the AG was temporarily away from her desk. (Id. at 3.)
As a preliminary matter, the Court concludes that AG Kane was absent for the purposes of the relevant state laws. The distinction between "absent" and "vacant" in Section 213 of the Administrative Code and 71 P.S. § 762 indicates that the Pennsylvania legislature intended an absence to be temporary. The length of time AG Kane was actually "out of pocket" is irrelevant; she was far away from the Commonwealth, traveling to a foreign country that was still recovering from a natural disaster and had spotty cell phone service, and both Smith and COO Tyler were unable to immediately reach her despite numerous calls and voicemail messages. At the time the designation *407 letter and the wiretap application were signed, no one in the AG's Office had any idea how long AG Kane would be unreachable, the wiretap application process was fast moving, and the overall work of the AG's Office needed to proceed.[7] This is precisely the sort of situation these state laws seek to address by permitting (or in the case of Section 762, requiring) official business to continue, even when the AG is unavailable.
Next, Defendants argue that even if AG Kane was absent and unreachable when the wiretap application was signed, she became "reachable" before the wiretap application was presented to Judge Bowes, and AG Kane should have acted to prevent its approval. (Id. at 2.) If the Administrative Code applies to the facts in this case, this argument has no merit. A First Deputy's actions, taken during the AG's absence, do not become void upon the AG's return-this, quite plainly, would defeat the purpose of Section 213 of the Administrative Code and the other provisions of state law allowing state departments to operate in the absence of the department head. If Deputy King was authorized to execute the wiretap application in AG Kane's absence under the Administrative Code, the Commonwealth Attorneys Act, and/or 71 P.S. § 762, the application was valid when signed, and AG Kane was under no obligation to prevent it from being presented to Judge Bowes. In fact, as this Court will discuss later, the fact that she made no efforts to "undo" Deputy King's execution of the application gives additional credence to the Government's assertions that (1) AG Kane fully supported and approved of the wiretap application and believed Deputy King was authorized to sign it in her absence, even without a written designation letter, and (2) in any event, by not issuing any directive to undo Deputy King's or Smith's actions, knowing full well what they had done, AG Kane ratified or adopted those actions.
This brings us to the crux of Defendants' argument, which is that the Wiretap Act, a specific state statute enacted to address state wiretap applications, controls over more general statutes addressing the workings of state departments (including the AG's Office) when the top official is absent. (Defs.' Joint Suppl. Mem., ECF No. 370, at 8-9.) Defendants assert that the relevant provisions of state law cited above are irreconcilable, since only the Wiretap Act requires a written designation while the others seem to apply automatically when the AG is absent. Pointing to the Pennsylvania rules of statutory interpretation, Defendants say that in the case of conflicting statutes, the specific *408 statute governs the general and that courts are to construe statutes in a way that avoids rendering any provision void or superfluous. See 1 Pa. C.S. §§ 1921, 1922, 1933. Defendants maintain that to allow the Administrative Code, or any other provision of Pennsylvania law dealing with the absence of the AG in a more general sense, to sidestep an explicit requirement of the Wiretap Act-namely, a designation in writing-would controvert legislative intent. (Id. at 2-4, 9; Def. Perrin's Reply to Gov't's Findings of Fact and Conclusions of Law, ECF No. 362, at 1.)
The Government, in contrast, contends that the relevant statutory provisions complement one another and are not in conflict, and therefore the Pennsylvania rules of statutory interpretation on which Defendants rely are not applicable to this case. (Gov't's Suppl. Mem., ECF No. 371, at 4-5.) Under the Government's interpretation, because AG Kane was absent, the Administrative Code and the Commonwealth Attorneys Act empowered Deputy King, as First Deputy AG, to perform the duties of the AG, including executing wiretap applications. (Gov't's Suppl. Legal Authority, ECF No. 321, at 2; ECF No. 361, at 35.)
The Court agrees that in light of AG Kane's absence, Deputy King was authorized to execute the wiretap application under the Administrative Code, as supplemented by the Commonwealth Attorneys Act, and 71 P.S. § 762. The relevant provisions of state law are not inconsistent, and this interpretation does not render the Wiretap Act's written designation provision superfluous. The Wiretap Act permits an AG to make written designations during his or her time in office, but it does not require it. See 18 Pa. C.S. § 5708. Further, if the AG decides to make designations, the AG may designate any deputy AG-not necessarily just the First Deputy. Id. This is distinct from the chain of command that would otherwise kick in upon the AG's absence under the Administrative Code. Additionally, under the Wiretap Act, it appears a designation may be ongoing and not incident-specific. Id. Presumably, AG Kane could have signed a designation letter on her first day in office, designating a particular deputy to handle wiretaps in case of her absence at any point in her term; however, the Wiretap Act did not require her to do that.
Any other interpretation of the Wiretap Act would require all wiretap applications to grind to a halt during an AG's absence, precisely when time is of the essence,[8] even if her absence was unexpected and no Wiretap Act designation had been made. Absences (and their duration) cannot always be planned in advance, especially when the boss has departed on a personal trip kept under wraps to visit a foreign locale still on the road to recovery from a natural disaster. More generally, knowing that a written designation might be needed is not always feasible or foreseeable. When AG business must nevertheless be done, the Administrative Code steps in to allow the office to operate, as it did in this case.
A review of the dates that the relevant statutory provisions were enacted further supports this Court's conclusion that the involved statutes are not irreconcilable. First came 71 P.S. § 762, which was enacted on March 22, 1917. On April 9, 1929, the Pennsylvania legislature enacted the Administrative *409 Code. 71 P.S. § 51. The Wiretap Act, which was enacted in October 1978, came next. 18 Pa. C.S. § 5701. Section 5708 of the Wiretap Act has been amended on various occasions since 1978, but none of these amendments alter or modify the written designation provision. (See Defs.' Joint Suppl. Mem., ECF No. 370, at 8 & n.1.) Finally, the relevant provisions of the Commonwealth Attorneys Act were enacted last, in October 1980. 71 P.S. § 732-101(a). The Commonwealth Attorneys Act applied the Administrative Code-including the absence provision-to the AG's Office. Id. § 732-201(a). Because this occurred only two years after the Wiretap Act was enacted, we should logically presume that the legislature knew about the Wiretap Act and its written designation provision. See, e.g. , Cannon v. Univ. of Chi., 441 U.S. 677, 686-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law ....") We should also presume that the state legislature knew it could carve out exceptions (including one as to wiretap applications) to the First Deputy's power to serve as Acting AG-indeed, the Administrative Code, and by extension the Commonwealth Attorneys Act, includes two explicit exceptions preventing a First Deputy from appointing personnel or exercising certain powers reserved for the AG in the state constitution. See 71 P.S. § 73 ; id. § 732-201. Despite this, the legislature chose not to create a similar exception as to executing wiretap applications. Thus, the Court concludes that Pennsylvania law has intended for the absence provision of the Administrative Code to allow the First Deputy AG to execute the non-excluded duties of the AG, including executing a wiretap application, during an AG's absence. Indeed, this provision is particularly important in just this sort of case, where the AG is unexpectedly (or perhaps more precisely in this case, somewhat mysteriously) absent in circumstances fraught with uncertainty as to her whereabouts and accessibility, there is no written designation, and the business of the AG's Office-in this case, the process of executing a time-sensitive wiretap application-cannot grind to a halt for an indeterminate period of time.
B. Did the April 14 wiretap violate federal wiretap law?
Defendants do not claim that the April 14 wiretap violated federal law independent of the alleged state law violation, which the Court has dispensed with above. Recognizing the complex choice of law and statutory interpretation issues before us, however, the Court will continue with its analysis of federal law to determine whether, had the April 14 wiretap violated state law, the evidence should be suppressed in federal court.
Defendants argue that a federal court must apply both state and federal law in analyzing the validity of wiretaps procured under state law. (ECF No. 359, at 28.) They say that where state law is more rigorous than federal law, courts analyzing the validity of wiretaps under Title III must defer to state law. (Id. at 28, 32.) Defendants rely on 18 U.S.C. § 2516(2), which provides:
The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or *410 approving the interception of wire, oral, or electronic communications ....
18 U.S.C. § 2516(2) (emphasis added). In this case, Defendants argue, because the state law requirement of a written designation of authority is more stringent than federal law, the state law requirement controls. (ECF No. 359, at 28, 32.)
The Government, in contrast, asserts that even where wiretaps were obtained under state law, Title III provides the framework for deciding whether the electronic evidence is admissible in federal criminal proceedings. (ECF No. 361, at 29 n.6.) Although certain provisions of Title III do incorporate state law requirements, and courts may initially apply both state and federal law to evaluate the validity of a wiretap authorization, whether evidence derived from a state wiretap is admissible in federal court is a question of federal, rather than state, law. (Id. at 30.) Further, suppression is not mandated for every violation of Title III. (Id. ) Rather, the Government asserts that evidence derived from a wiretap authorized in violation of state law is subject to suppression under Title III only when that violation implicates a core concern of Title III. (Id. at 32.) In this case, the Government maintains, even if AG Kane's failure to sign the designation letter violated state law, this failure does not involve a core concern of Title III and is not a basis to suppress the challenged evidence in federal court. (Id. at 36.)
This Court concludes that applicable Third Circuit precedent supports the Government's interpretation of Title III. As an initial matter, an overview of the standard for suppressing wiretap evidence under Title III is relevant here. Evidence may be suppressed in federal court under Title III only if one of the three grounds set out in § 2518(10)(a) is satisfied. Williams, 124 F.3d at 426 (citing United States v. Giordano, 416 U.S. 505, 524, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) ). This provision provides, in relevant part:
Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that-
(i) the communication was unlawfully intercepted;
(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
(iii) the interception was not made in conformity with the order of authorization or approval.
18 U.S.C. § 2518(10)(a). Of these three grounds, only the first-that the communication was unlawfully intercepted-is potentially relevant here. Importantly, the fact that a wiretap violated a state or federal law may not be enough to consider it "unlawfully intercepted" for the purposes of § 2518(10)(a). The Supreme Court, as well as our Court of Appeals, has held that "not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful' under § 2518(10)(a)(i)." Williams, 124 F.3d at 426 (quoting United States v. Donovan, 429 U.S. 413, 433, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977) ). Indeed, "it is apparent from the scheme of the section that paragraph (i) was not intended to reach every failure to follow statutory procedures, else paragraphs (ii) and (iii) would be drained of meaning." United States v. Chavez, 416 U.S. 562, 575, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (citing *411 Giordano, 416 U.S. at 526, 94 S.Ct. 1820 ). Rather, suppression is mandated only when a violation amounts to a "failure to satisfy any of those statutory requirements that directly and substantially implement" Congress's purposes in passing Title III. Id. (quoting Donovan, 429 U.S. at 433-34, 97 S.Ct. 658 ) (emphasis added); see also United States v. Glover, 736 F.3d 509, 513 (D.C. Cir. 2013) (stating that § 2158(10(a)(i) requires "a broad inquiry into the government's intercept procedures to determine whether the government's actions transgressed the 'core concerns' of the statute").
Congress enacted Title III with the stated purposes of "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." 18 U.S.C. § 2510 (congressional findings); see also Gelbard v. United States, 408 U.S. 41, 48, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). Other courts construing federal wiretaps under Title III have concluded that only those substantive requirements that concern privacy and preventing the government's unauthorized use of surveillance techniques, rather than more technical requirements, implicate the core concerns of Title III.[9]
This requirement that the violated statutory provision must "directly and substantially" implement Congress's intent in passing Title III to justify suppression of the evidence, which the Third Circuit outlined in Williams, guides this Court's conclusion that the same standard holds for violations of state statutory provisions. Thus, state law affects the admissibility of wiretap evidence in federal court to the extent that the violated state law provision directly and substantially implements the core concerns of Title III. See Williams, 124 F.3d at 426 ; see also United States v. Vario, 943 F.2d 236, 244 (2d Cir. 1991) ("[I]n in determining whether to admit a [state] wiretap ..., [courts need] apply only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character.") (citing United States v. Sotomayor, 592 F.2d 1219, 1225 (2d Cir. 1979) ); United States v. Nelson, 837 F.2d 1519, 1526 (11th Cir. 1988) (communications intercepted in violation of the state law not suppressed because they did not implicate a core concern of Title III). As the Northern District of Georgia has explained:
Whether the wiretap order is valid under state law and if not the nature of the violation are important concerns; however, compliance with state law is just the first inquiry. If the wiretap order does violate state law, the second inquiry is admissibility, which takes into consideration the nature of the state-law violation but in the context of determining whether that violation implicates the core concerns of Title III, i.e., "the federal concerns."
United States v. Govea-Vazquez, 962 F.Supp.2d 1325, 1330 (N.D. Ga. 2013), aff'd sub nom. United States v. Lara, 588 Fed.Appx. 935 (11th Cir. 2014).
*412 Contrary to Defendants' arguments, a violation of a state wiretap statute does not automatically lead to suppression of the evidence in federal court, even if the violation might have led to suppression in state court. Williams, 124 F.3d at 427-28. The question before us, then, is whether Pennsylvania's requirement of a designation in writing is a statutory requirement that directly and substantially implements Congress's purposes in enacting Title III.
The Court concludes that requiring a written designation does not directly and substantially address the core concerns of Title III, which are to protect the privacy of individuals and create a uniform basis for authorizing wiretaps. What was required-and what did directly and substantially implement Congress's intent in enacting Title III-was that the high-ranking state officer executing the wiretap application be authorized to do so. Indeed, chief among Congress's concerns when passing Title III was that an individual and identifiable high-level Justice Department official be held accountable for executing wiretap applications.[10] That requirement was fulfilled in this case. The record before the Court demonstrates that AG Kane was well aware that the Montgomery investigation was proceeding towards a wiretap, and that AG Kane and Deputy King spoke on the phone on the evening of April 13 about this very topic. (ECF No. 359, ¶¶ 53-54; ECF No. 361, ¶ 85.) The Court further finds credible Deputy King's testimony that on this phone call, he and AG Kane discussed the meeting to execute the wiretap application the following day, and that AG Kane orally and actually directed Deputy King to act in her stead. (ECF No. 361, ¶¶ 88-89.) The record also reflects that AG Kane told COO Tyler that she believed Deputy King was authorized to sign the wiretap application without a written designation letter, which strongly suggests that AG Kane had authorized Deputy King to execute the wiretap application. (Id. ¶ 109.) Finally, AG Kane knew that Deputy King had signed the wiretap application before it was submitted to Judge Bowes and did nothing to stop that presentation. Even if the fact that this authorization was not reduced to a written designation violated a state law requirement, given the weight of evidence in the record demonstrating that the authorization in fact occurred, any state statutory requirement that AG Kane personally and physically sign the designation letter was substantially fulfilled. Thus, the core concern of Title III that a high-ranking executive law enforcement official approve any such application was met.
*413 C. Did AG Kane ratify Deputy King's execution of the April 14 wiretap?
The Government further asserts that even if AG Kane had not authorized Deputy King to execute the April 14 wiretap application prior to her leaving for Haiti (a hypothetical not borne out by the record), she later adopted and ratified both Smith's signature on the designation letter and Deputy King's execution of the wiretap application. (ECF No. 361, at 43.) Defendants counter that the agency principle of ratification is not applicable in criminal cases where there is a statutory scheme that must be followed. (ECF No. 359, at 42.)
The Court concludes that, although it may well be the rare case where the principles of adoption and ratification are appropriately applied in the context of a criminal prosecution, this is just such a case. Given the overwhelming evidence in the record that AG Kane (1) was aware that the investigation was proceeding towards a wiretap; (2) learned that the designation letter and wiretap application had in fact been signed in time to prevent the application from proceeding to Judge Bowes and did nothing (zero) to stop that process in its tracks; and (3) then objectively supported and extended that wiretap rather than doing anything to stop it, AG Kane ratified Deputy King's conduct, making it her own.
Ratification is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1) (Am. Law Inst. 2006). It requires an "externally observable manifestation of assent to be bound by the prior act of another person." Id. § 4.01 cmt. b. A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf. Id. § 4.03. Most significantly for our purposes, courts have held that "[r]atification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions." In re Monitronics Int'l, Inc. , 223 F.Supp.3d 514, 520 (N.D.W.V. 2016) (quoting Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co., 376 F.3d 664, 677 (7th Cir. 2004) ). The Court concludes that AG Kane ratified both Smith's signature on the designation letter and Deputy King's signature on the April 14 wiretap application.
Regarding the designation letter, the record reflects that Smith believed she was acting on AG Kane's behalf when she signed Kane's name on the designation letter. (ECF No. 359, ¶ 102.) AG Kane had directed that Smith could sign the letter if necessary (albeit after speaking with Kane on the phone, which was not possible due to Kane's absence), and Smith had so acted when signing AG Kane's name on other documents in the past. (Id. ¶ 100; ECF No. 361, ¶ 69.) When AG Kane learned that Smith had signed the letter, she told Smith she had "made a bad situation worse," but she took no action whatsoever to repudiate or undo what Smith had done.[11] (ECF No. 359, ¶¶ 108, 111.) AG Kane did not direct Smith to rip up the letter or otherwise retract the signature, or tell Deputy King (or anyone else) that she had not designated him to serve as Acting AG. (Id. ¶¶ 112, 117.) The letter remained intact and in *414 effect until AG Kane's return to the office on April 22. On April 14, Smith offered her resignation for signing the letter, which AG Kane refused. (Id. ¶ 109.) Thus, although her words demonstrated she may not have been pleased that the letter had been signed (for reasons not apparent in the record), AG Kane's conduct objectively manifested her intent to be bound by and to adopt Smith's and Deputy King's actions. This is evidenced by her not repudiating Smith's action and by accepting Deputy King's conduct while he was serving as Acting AG-namely, that the business of the AG's Office continued, and the April 14 wiretap application was executed.
The case for AG Kane's ratification of the April 14 wiretap application itself is even clearer. Believing AG Kane had designated him to sign the wiretap application based on their phone call on April 13, Deputy King acted accordingly when he executed the April 14 wiretap application. (See ECF No. 361, ¶ 100.) The record does not reflect that AG Kane had any sort of negative or even surprised reaction when she learned the wiretap application had been signed, which is fully consistent with her belief that Deputy King was authorized to sign the application (with or without the designation letter). Her only asserted reaction was as to Smith's actions. AG Kane knew that the wiretap application had been executed before it was presented to Judge Bowes on April 16. She took no action to stop the application from being presented, although she had both the power and plenty of opportunity to do so. (ECF No. 359, ¶¶ 107, 117.) Then, during the senior management meeting held when AG Kane returned to the office on April 22, she asserted no reservations or objections concerning the wiretap investigation proceeding. (ECF No. 361, ¶¶ 119, 122-23.) AG Kane subsequently executed a continuation application for the April 14 wiretap, then a new wiretap application for Defendant Perrin's phone, and then a new wiretap application for Defendant Montgomery's second phone, all based on information gained from and incorporating the April 14 wiretap. (ECF No. 359, ¶¶ 20-32.) These subsequent applications and continuations, combined with the fact that AG Kane never repudiated or even expressed disapproval of Deputy King's execution of the April 14 wiretap application, never recalled or revoked the designation letter signed via Smith, and issued no directive to halt that process, convinces this Court that AG Kane fully approved, adopted, and ratified Deputy King's conduct relative to the application.
Defendants argue that AG Kane's conduct after the April 14 wiretap application was executed was neither adoption nor ratification-rather, it was an AG acting to protect her team, knowing the execution of the application was invalid. (Id. at 41-42.) In essence, Defendants assert that it was easier for AG Kane to stick her head in the sand than to come clean about a "mistake." The fact that AG Kane knew about the wiretap application before it was presented to Judge Bowes undermines Defendants' argument. For that time period, there was no third party to have to confess error to, or to shield from disclosure. As Defendants pointed out during oral argument, the AG's Office is a team. From April 14 to April 16, the wiretap application had not yet left the confines of the team-AG Kane's own team. It would have been a very easy solution if she wanted to repudiate her First Deputy's conduct by directing her team to not submit the wiretap application to Judge Bowes. She did not, and she adopted the signed wiretap application and Deputy King's actions in signing and submitting it. Thus, by the time Judge Bowes actually issued the order approving the wiretap on April 16, AG Kane had fully adopted Deputy King's conduct.
*415 Further, even after the wiretap order was issued, if AG Kane believed the wiretap application or resulting wiretap was improper, she had an independent obligation as an officer of the court (and especially as AG) to report this situation to the judge if she believed it was unlawful. She did not do that. She also could have issued a directive that the wiretap order not be carried out. She did not. Instead, the evidence in the record compels the conclusion that AG Kane actively and actually approved of, supported, extended, and ratified the April 14 wiretap application and Deputy King's and Smith's actions regarding it.
D. Does the agents' good faith reliance on the wiretap order preclude suppression?
Finally, the Government argues that even if the April 14 wiretap application was invalid, the resulting intercepted evidence should not be suppressed because law enforcement agents relied in good faith on the wiretap order. (ECF No. 361, at 51-53.) Defendants assert that the good faith exception to the exclusionary rule, established by the Supreme Court in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), does not apply in wiretap cases because it is a judicially created remedy not provided for in Title III. (ECF No. 359, at 42-45.)
Whether the good faith exception applies in wiretap cases under Title III is an unsettled issue in the Third Circuit, and the other Courts of Appeals addressing this issue are split. Although the Sixth Circuit and the D.C. Circuit have declined to extend the good faith exception to suppression to Title III wiretap cases, at least four other Circuits have applied that doctrine in Title III cases. Compare United States v. Rice, 478 F.3d 704, 712-13 (6th Cir. 2007), and Glover, 736 F.3d at 515-15, with United States v. Brewer, 204 Fed.Appx. 205, 208 (4th Cir. 2006), United States v. Moore, 41 F.3d 370, 376-77 (8th Cir. 1994), United States v. Butz, 982 F.2d 1378, 1382-83 (9th Cir. 1993), United States v. Reed, 575 F.3d 900, 917 (9th Cir. 2009), Lara, 588 Fed.Appx. at 938, and United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988). As the Eighth Circuit stated in Moore:
Leon of course dealt with the judicially developed exclusionary rule for Fourth Amendment violations, whereas we deal here with a statutory exclusionary rule imposed for a "violation of this chapter." However, § 2518(10)(a) is worded to make the suppression decision discretionary ("If the motion is granted"), and its legislative history expresses a clear intent to adopt suppression principles developed in Fourth Amendment cases.... Therefore, we conclude that the subsequently-developed Leon principle applies to § 2518(10)(a) suppression issues.
41 F.3d at 376 (internal citation omitted).
This Court concludes that the reasoning of the Fourth, Eighth, Ninth, and Eleventh Circuits is persuasive and that at least in the circumstances present here, the good faith exception extends to the statutory suppression remedy for wiretaps under Title III. The policy considerations the Supreme Court discussed in United States v. Leon and its progeny apply in equal measure to wiretaps under Title III. As the Supreme Court has stated, those policy considerations are:
Where suppression fails to yield "appreciable deterrence," exclusion is "clearly ... unwarranted."
Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. The analysis must also account for the "substantial social costs" generated by the rule. Exclusion exacts a heavy toll on both the judicial system *416 and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.
Davis v. United States, 564 U.S. 229, 237, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (internal citations omitted).
Application of the good faith doctrine to the odd (and, hopefully, never reoccurring) facts of this case renders suppression unwarranted. As the record reveals, excluding the evidence from the April 14 wiretap would be highly unlikely to deter any future official misconduct because the state and federal employees who were involved in the wiretap application had all thought that they were complying with the law. (See, e.g., ECF No. 359, ¶¶ 36, 72, 112; ECF No. 361, ¶ 162.) As described above, the Court finds credible the testimony that Deputy King and AG Kane spoke on the phone on the evening of April 13 and that AG Kane gave Deputy King specific authority to execute the wiretap application. (ECF No. 361, ¶ 100.) Smith also believed she had authority to sign the designation letter, based on AG Kane's directions to her before Kane left for Haiti. (Id. ¶ 101.) Smith signed the letter, and Deputy King signed the wiretap application, believing they were doing their jobs consistent with the law, and as noted above the Court has concluded that under state law, Deputy King had the legal authority to so act. Both were acting in good faith based on their communications with AG Kane. Further, no one else in the AG's Office had any reason to doubt the validity of the wiretap order, and they executed it faithfully. (ECF No. 359, ¶¶ 36, 72, 112; ECF No. 361, ¶ 162.) Indeed, the lead agent on the case did not learn about any designation letter issue until reading the affidavit of probable cause in the criminal case filed against AG Kane in August 2015, over a year after the wiretap was implemented. (ECF No. 359, ¶ 36; ECF No. 361, ¶ 162.)
The only possible source of deterrence served by exclusion in this case would be as to the behavior of AG Kane herself. It is apparent that AG Kane created deep-seated problems in the AG's Office while this investigation was proceeding, amplified by the odd, opaque, and mysterious circumstances she created as to her Haiti adventure. The people of Pennsylvania plainly deserved better from the AG, and she has now been forced from office. Once the wiretap order was signed, it was faithfully executed by subordinate state officials and law enforcement officers. This is a textbook example of good faith by those subordinate officers. For these reasons, the evidence derived from the April 14 wiretap will not be suppressed.
E. Defendant Montgomery's remaining challenges to the April 14 wiretap
Defendant Montgomery asserts the following additional challenges to the validity of the April 14 wiretap application: (1) the April 14 wiretap application, as well as the applications for subsequent wiretaps, failed to include all necessary and relevant facts as required by 18 U.S.C. § 2518(1)(b) ; (2) the April 14 wiretap, along with the subsequent wiretap order issued in May, were not based upon sufficient probable cause to satisfy § 2518(3) ; (3) the affidavits in support of the wiretap application contained material misrepresentations that should be excised from the affidavits of probable *417 cause pursuant to the Supreme Court's decision in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ; (4) law enforcement failed to minimize the collection of intercepted information as required by § 2518(5) ; and (5) law enforcement failed to place intercepted audio under seal pursuant to § 2518(8)(a). (See Def. Montgomery's Mem. of Law in Supp. of Mot. to Suppress Wire Intercepts, ECF No. 198 ("ECF No. 198"), at 29-39.) The first three of these challenges depend, in whole or in part, upon whether Deputy King was authorized to execute the April 14 wiretap application. Given the Court's determination that Deputy King was authorized to execute the application, the Court will deal with these challenges first. The Court will then address Defendant Montgomery's minimization and sealing challenges.
1. Statement of necessary and relevant facts
Defendant Montgomery first argues that the fact that AG Kane did not properly authorize Deputy King to execute the April 14 wiretap application was a necessary and relevant fact that was required to be included in the affidavit in support of the wiretap application. (Id. at 28-29.) Because the Court has concluded that Deputy King was properly authorized, this challenge is moot.
Defendant Montgomery further argues that certain purportedly necessary and relevant facts were included in the April 14 wiretap application that were not included in the subsequent applications in May or June, or vice versa (that is, certain facts that occurred prior to April 14, 2014, were included in the May or June wiretap applications but were not included in the April 14 application). Of the latter instance, Defendant Montgomery provides three purportedly necessary facts omitted from the April 14 wiretap application: (1) "video surveillance of Montgomery's residence showed an unidentified male going in and out before the wiretap was activated"; (2) "prior criminal records of Montgomery showed he had not cooperated with law enforcement in the past"; and (3) "there were limitations of the camera surveillance due to the angle of the camera and lack of clarity at night." (Id. at 28.)
18 U.S.C. § 2518(1)(b) requires an affidavit for a wiretap application to provide "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued." It does not require the affiant to list every possible fact related to the investigation. See, e.g. , United States v. Mamalis, 498 Fed.Appx. 240, 246-47 (4th Cir. 2012). The Court does not see, and Defendant Montgomery does not explain, why the three omitted facts listed above or the facts purportedly omitted from the May and June wiretap applications would have been material in the Superior Court Judge's decision to issue the wiretap orders, particularly in light of this Court's conclusion that Deputy King acted lawfully. See United States v. Rajaratnam, 719 F.3d 139, 151-52 & n.16 (2d Cir. 2013) (requiring a showing of materiality to challenge factual omissions in an affidavit of probable cause supporting a wiretap application under § 2518(1)(b) ). Accordingly, the Court denies Defendant Montgomery's Motion on this ground.
2. Probable cause and necessity
Next, Defendant Montgomery argues that the affidavit in support of the April 14 wiretap application, as well as the subsequent wiretap application in May, lacked sufficient probable cause and that the assertions of the necessity of the wiretap were conclusory and boilerplate. (ECF No. 198, at 29-31.) He asserts that the affidavit's "primary averment[ ]" to create *418 probable cause for the wiretap was a confidential informant's controlled drug buy from Defendant Montgomery in January 2014. (Id. at 29.) Defendant Montgomery argues that this controlled buy does not establish probable cause that a wiretap on his phone would intercept future communications concerning similar criminal activity. (Id. at 29.) A review of the basis of probable cause set out in the affidavit accompanying the April 14 wiretap application (spanning 29 pages) reveals that the affidavit contains more than the sole controlled drug purchase Defendant Montgomery challenges, although this purchase goes a long way to establishing probable cause. (See App. to Pre-Trial Mots., ECF No. 197-4, at 94a-122a.) Information obtained from confidential informants about Defendant Montgomery and his associates, a pen register and trap and trace on Defendant Montgomery's device, and other sources of information all directly support the conclusion that Defendant Montgomery was involved in a cocaine and heroin distribution operation. Accordingly, the Superior Court Judge had a substantial basis for concluding that there was probable cause to issue the April 14 wiretap order. (App. to Pre-Trial Mots., ECF No. 197-4, at 94a-122a.)
Defendant Montgomery also challenges the affidavit accompanying the May wiretap application, arguing that the information gleaned from the April 14 wiretap cannot be used to establish probable cause for subsequent wiretaps since the April 14 wiretap application was not properly authorized. (ECF No. 198, at 30-31.) Once this "tainted" information is excluded, Defendant Montgomery urges, the May wiretap application is similarly lacking in probable cause. (Id. ) Given the Court's finding that the Superior Court Judge had a substantial basis for concluding there was probable cause to issue the April 14 wiretap, in addition to its conclusion that the April 14 wiretap application was properly authorized, there was certainly probable cause to issue the May wiretap order.
Defendant Montgomery also challenges the assertions of necessity in the April 14 and May wiretap applications as conclusory and boilerplate statements, arguing that there is no probable cause to believe that continued use of normal investigative techniques would not be successful. (Id. at 29-31.) The Court disagrees. A review of the necessity of the wiretap, explained in the affidavit of probable cause supporting the April 14 wiretap application, leads this Court to conclude that the Superior Court Judge had a sufficient basis for issuing the wiretap order. (App. to Pre-Trial Mots., ECF No. 197-4, at 123a-30a.) At this juncture, the Court does not review the affidavits accompanying the challenged wiretap applications in a hypertechnical manner, but rather with an eye toward making a common-sense determination and giving deference to the issuing judge's determination. See Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ; United States v. Macklin, 902 F.2d 1320, 1325 (8th Cir. 1990). To this end, the Court notes that the fact that the investigatory problems law enforcement officers faced in Defendant Montgomery's case commonly arise in other drug trafficking investigations does not make them any less problematic. Indeed, any similarities between this affidavit and those in other large-scale drug trafficking investigations are unsurprising, since this is the crime for which Defendant Montgomery was being investigated. Nonetheless, the affidavit contains sufficient explanation of particular instances in which normal procedures-such as confidential informants, physical surveillance, and other techniques-were attempted in Defendant Montgomery's case but were unlikely to succeed in the future. (See, e.g., *419 App. to Pre-Trial Mots., ECF No. 197-4, at 123a-24a.) The Court denies Defendant Montgomery's Motion on this basis.
3. Franks hearing
Defendant Montgomery requests a Franks hearing in this case, asserting that the affidavits in support of the wiretap applications contained material omissions of fact-specifically, according to Defendant Montgomery, the fact that Deputy King was not authorized to execute the April 14 wiretap application. ECF No. 198, at 36-39; see also Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Given the Court's conclusion that AG Kane had properly authorized Deputy King to execute the April 14 wiretap application, there is no material omission from the affidavits that would have impacted the Superior Court Judge's decision to authorize the wiretaps, let alone a reckless or intentional omission required under Franks. See 438 U.S. at 171, 98 S.Ct. 2674. Accordingly, Defendant Montgomery's Motion on this basis is denied.
4. Minimization
Defendant Montgomery also alleges that law enforcement failed to properly minimize the number of non-pertinent communications that were collected and asks the Court to suppress the wiretap evidence on this basis. Recognizing the practical difficulties in minimizing non-pertinent intercepted conversations, the Supreme Court has directed that the proper test is whether law enforcement's minimization efforts were reasonable under the totality of the circumstances. Scott v. United States, 436 U.S. 128, 136-37, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).
The Court concludes that, based on the record before it, law enforcement's minimization efforts were reasonable under the circumstances in this case. This was a drug trafficking investigation involving a widespread conspiracy, for which Defendant Montgomery was suspected to be a central participant. In these cases, more extensive surveillance and, thus, narrower minimization is often necessary. Id. at 140, 98 S.Ct. 1717. Defendant Montgomery's primary challenge to the minimization efforts in this case is his assertion that law enforcement "intend[ed] to intercept the content of all communications to prove an irrelevant negative (that Defendant never mentioned any lawful employment in any of his communications)." (ECF No. 198, at 35.) Defendant is correct that proof of a lack of lawful employment is not necessary to a drug-trafficking prosecution; however, Title Ill's minimization requirement does not mean agents may only discover the minimum amount of evidence necessary to make their case. See 18 U.S.C. § 2518(5). Further, law enforcement's interest in monitoring Defendant Montgomery's communications for proof of lawful employment was reasonable, given that he held significant assets without an apparent way to obtain them beyond his suspected profits from drug trafficking. The Court denies Defendant Montgomery's Motion to Suppress on this basis.
5. Sealing
Finally, as a fifth basis to suppress the wiretap evidence, Defendant Montgomery challenges whether law enforcement properly placed intercepted audio under seal in accordance with 18 U.S.C. § 2518(3)(b) and/or (c). (ECF No. 197, ¶ 30.) In response to his Motion, the Government provided Defendant Montgomery with copies of the sealing orders for each of the wiretaps. (See Gov't's Omnibus Resp. to Mots. to Suppress Wire Intercepts, ECF No. 235 ("ECF No. 235"), at 35; Tr. of Suppression Hearing of June 14, 2017, ECF No. 337, at 23-25.) Each order contained the stamp of the Prothonotary of the Superior Court of *420 Pennsylvania, indicating receipt of the wiretap recordings under seal at each docket. (See ECF No. 235, at 35.) Counsel for Defendant Montgomery has produced no basis to call into question the veracity or validity of those sealing orders, and this Court is satisfied that proper sealing occurred in accordance with Title III. Defendant Montgomery's Motion is denied on this basis.
III. Conclusion
For the reasons stated in this Opinion, Defendants Price Montgomery, James Perrin, and Charles Cook's Motions to Suppress at ECF Nos. 138 and 197 are denied.
An appropriate Order will follow.

This is particularly so in this circumstance, where AG Kane had decided to be far less than transparent as to her international travel plans and whereabouts. Although AG Kane traveled with some members of the AG's Office-specifically, her sister (a supervisory attorney in the AG's Office) and some law enforcement agents with the AG's Office-the purpose of the trip was personal and none of the attendants traveled in their official capacities. (ECF No. 361, ¶ 60.) Indeed, it appears that AG Kane wanted to keep her trip to Haiti confidential, and at least one agent who went on the trip was told to keep it quiet and not discuss the trip publicly. (Id. ¶ 61.) A private security team was hired for the group, rather than AG Kane's official security detail. (Id. ) Other than Kane's travel companions, the record reflects that few, if any, members of the AG's Office knew the nature or location of AG Kane's travels until shortly before she departed. (Id. ¶ 62.) This includes Smith, AG Kane's executive assistant. Smith wasn't involved in making scheduling or travel arrangements for the trip, and AG Kane's calendar did not reflect that Kane was traveling to Haiti until shortly before her departure from the Commonwealth. (Id. ¶¶ 55-57.) Each of these machinations necessarily fueled the uncertainty as to pretty much everything about AG Kane's absence.

See, e.g., ECF No. 359, ¶ 46. ("Once the wiretap application and supporting documents were in final form, time was of the essence at that point to get the application and affidavit signed and sworn within 24 to 48 hours because the probable cause in the affidavit could go stale, drugs could be moved, and, because a cell phone was involved, the target phone could be dumped and a new phone obtained before a wiretap is activated.")

See, e.g., Chavez, 416 U.S. at 575, 94 S.Ct. 1849 (misidentification of the officer authorizing the wiretap application did not implicate a core concern of Title III where the Attorney General actually gave the required authorization, because the reviewing and approval functions required by Congress were nevertheless fulfilled); Losinno v. Henderson, 420 F.Supp. 380, 384-85 (S.D.N.Y. 1976) (noting that failure to minimize the interception of communications not otherwise subject to interception, as required by the statute, would constitute a fundamental defect implicating the core concerns of Title III).

As the Court of Appeals for the District of Columbia noted in United States v. Scurry, Congress intended the requirement of a high-level Justice Department official to sign off on each wiretap application to play a central role in the Title III process. This application authorization requirement
centralizes ... the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen.
821 F.3d 1, 10 (D.C. Cir. 2016) (quoting S. Rep. No. 90-1097, at 97 ). Similarly, as the Supreme Court noted in Chavez, "There is little question that § 2518(1)(a) and (4)(d) were intended to make clear who bore the responsibility for approval of the submission of a particular wiretap application." 416 U.S. at 571-72, 94 S.Ct. 1849 ; see also United States v. Lomeli, 676 F.3d 734, 741 (8th Cir. 2012) (wiretap application violated core concern of Title III by failing to identify actual Department of Justice official who authorized wiretap application).

Many of Defendant Perrin's proposed findings of fact relate to testimony as to the degree to which AG Kane was "upset" or "very upset" or "angry" about Smith's actions. Those matters are beside the point. AG Kane's descriptive reaction to the phone call with Smith is irrelevant; what matters are Kane's actions and inactions. She rejected Smith's resignation and did not lift a finger to stop the wiretap application from proceeding to Judge Bowes, which she knew had been executed and was moving forward. She was the AG, empowered to stop that application in its tracks, and she did no such thing.