**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4696

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOEY LAMOND BRUNSON, a/k/a Flex,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Joseph F. Anderson, Jr., Senior District Judge.  (3:14-cr-00604-JFA-18)

Argued:  January 29, 2020                                Decided:  July 31, 2020

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined.  Judge Motz wrote a dissenting opinion.

**ARGUED:** David Bruce Betts, Columbia, South Carolina, for Appellant.  Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Brian A. Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Sherri A. Lydon, United States Attorney, Columbia, South Carolina, J.D. Rowell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Denver, Colorado, for Appellee.

NIEMEYER, Circuit Judge:

Joey Brunson, the defendant in this criminal prosecution, challenges the legality of three orders authorizing wiretaps on the ground that the orders did not, on their face, sufficiently identify the persons authorizing the applications for the orders, as required by law. The district court denied his motion to suppress evidence obtained from the wiretaps, and the evidence was used to convict Brunson of numerous drug-trafficking and related crimes.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("the Wiretap Act"), 18 U.S.C. § 2510 *et seq.*, authorizes federal judges to issue orders approving wiretaps when detailed statutory requirements are met. And it provides that when certain specified requirements are not met, the contents of any intercepted communications and evidence derived from them must be suppressed. *Id*. §§ 2518(4)(a)–(e); § 2518(10)(a).

The Wiretap Act authorizes the Attorney General and various other designated officials in the Department of Justice, including any Deputy Assistant Attorney General in the Criminal Division or National Security Division, to apply for a wiretap order, and it requires that *the application* for the order include the "identity of . . . the officer authorizing the application," 18 U.S.C. § 2518(1)(a), and also that *the order* authorizing the wiretap "specify . . . the identity of the agency authorized to intercept communications, and of the person authorizing the application," *id*. § 2518(4)(d). Failing the inclusion of this information, the order becomes "insufficient," and evidence obtained from the wiretap must be suppressed. *See id*. § 2518(10)(a)(ii).

In this case, the government identified *in each application* for a wiretap order the senior Justice Department official by title and name who authorized the application, but *in each proposed order* that it submitted to the district court, it included only the title, not the name of the official. Each order stated that the application for the order was authorized by "an appropriate official of the Criminal Division, United States Department of Justice, Deputy Assistant Attorney General, pursuant to the power delegated to that official by special designation of the Attorney General." The district court signed the order as submitted.

Brunson contends that because the orders did not include *the name* of each authorizing official, the orders were statutorily insufficient and therefore all evidence derived from them should have been suppressed. Accordingly, he argues that the district court erred in denying his motion to suppress.

We conclude that the wiretap orders were sufficient under the Wiretap Act because (1) the applications were in fact appropriately authorized by persons authorized by the Wiretap Act; (2) the orders on their face identified, albeit not by name, the Justice Department officials who authorized the applications; (3) the applications themselves, to which the orders on their face referred, did contain both the title and name of the official authorizing the application; and (4) the applications and proposed orders were submitted together as one package to the judge who signed the orders and later to Brunson, whose communications were intercepted, such that both the judge and Brunson actually knew both the title and name of the official authorizing each application. In addition, even if we were to assume that the omission of the name of the authorizing official in the orders was

3

a defect, it would not be the type of defect that rendered the orders "insufficient" under § 2518(10)(a)(ii). Therefore, we conclude that the district court did not err in denying Brunson's motion to suppress.

I

Joey Brunson was charged with participation in a drug-trafficking conspiracy in South Carolina and related crimes. In particular, the second superseding indictment, which the grand jury returned in March 2017, charged Brunson in Count 1 with conspiracy to traffic five kilograms or more of cocaine and an additional quantity of crack cocaine, in violation of 21 U.S.C. § 846; in Counts 2–7, with using a telecommunications facility for drug trafficking, in violation of 21 U.S.C. § 843(b); in Count 8, with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); in Count 9, with possession of cocaine and marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); in Count 10, with transporting a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1); in Count 11, with possession of a firearm in furtherance of drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); and in Count 12, with perjury, in violation of 18 U.S.C. § 1621.

In 2013, during the investigation that led to Brunson's indictment, the government sought judicial authorization under the Wiretap Act to intercept calls and texts over specified telephones. The first application for a court order disclosed that it was authorized by Deputy Assistant Attorney General Denis J. McInerney, and the district court issued the government's proposed order on July 31, 2013, authorizing the requested wiretaps. The

order stated that it was entered "pursuant to an application authorized by an appropriate official of the Criminal Division, United States Department of Justice, Deputy Assistant Attorney General, pursuant to the power delegated to that official by special designation of the Attorney General," but the order did not include the official's name. Pursuant to the order, the FBI intercepted various wire communications, including one on August 6, 2013, to which Brunson was a party and which became the basis for Count 2.

In a second application submitted to extend the district court's first order, the government used the same form as the first application except that it disclosed that the application was authorized by Deputy Assistant Attorney General Paul M. O'Brien. Again, the proposed order that the district court signed on August 29, 2013, included O'Brien's title but not his name. Pursuant to the order, the FBI intercepted additional wire communications, including one on September 3, 2013, to which Brunson was a party and evidence of which was presented at trial but did not form the basis for any substantive count.

Finally, the government submitted a third application to extend the district court's second order, and again the application was in the same form as the previous two applications, except that it disclosed that the application was authorized by Acting Assistant Attorney General Mythili Raman. Again, the proposed order that the district court signed on October 11, 2013, confirmed that the application had been authorized by an appropriate official, but did not include Raman's name. Pursuant to that order, the FBI intercepted wire communications, to which Brunson was a party, between October 11 through October 24, 2013, which became the basis for Counts 3 through 7.

Brunson filed a pretrial motion to suppress the evidence obtained from the intercepted communications on the ground that each of the district court's orders authorizing the interceptions failed to include *the name* of the official authorizing the application, and thus each order was "insufficient on its face," as that phrase is used in 18 U.S.C. § 2518(10)(a)(ii). The district court denied the motion on the ground that the wiretap orders substantially complied with the Wiretap Act because they were based on and referred to the applications, which identified the authorizing officials both by title and name.

The jury thereafter convicted Brunson on all 12 counts of the indictment.

Several months after Brunson was convicted, he filed a motion for a new trial based on the intervening Supreme Court decision in *Dahda v. United States*, 138 S. Ct. 1491 (2018), in which the Supreme Court upheld as facially sufficient wiretap orders that illegally authorized the interception of communications outside the district court's territorial jurisdiction. In its opinion, the Court explained that an order would be facially insufficient if, for example, it "lack[ed] information that the wiretap statute [in §§ 2518(4)(a)–(e)] require[d] it to include" but that the district court's territorial jurisdiction was not required to be included in wiretap orders. *Dahda*, 138 S. Ct. at 1499–1500.

The district court denied Brunson's motion for a new trial, ruling first that the motion was untimely, as it was filed four months after Brunson's conviction, and second, that the Supreme Court's holding in *Dahda* did not disturb its pretrial ruling denying Brunson's motion to suppress. In addition, the court noted that even though the wiretap

6

orders did not include the *names* of the officials authorizing the application, the orders referred to the applications, which did include the names.

On September 24, 2018, the district court sentenced Brunson to life plus 60 months' imprisonment. From the district court's judgment dated September 25, 2018, Brunson filed this appeal, contending that the district court erred in denying his motion to suppress because the wiretap orders were facially insufficient as they failed to include the names of the officials authorizing the various applications for the orders.

Almost three months after Brunson was sentenced and while this appeal was pending, Congress enacted the First Step Act of 2018 ("FSA"), Pub. L. 115-391, 132 Stat. 5194 (Dec. 21, 2018), which authorized some sentence reductions for offenses committed "before the date of enactment of [the] Act, if [the] sentence for the offense ha[d] not been imposed as of [the] date of enactment." FSA § 401(c). Brunson filed a motion in the district court on February 27, 2019, for a reduction of his sentence based on the FSA, and on April 10, 2019, the district court denied the motion on the ground that the FSA did not apply to Brunson because he was sentenced before the statute's effective date. Brunson also seeks review of the district court's denial of FSA relief.

II

A

In support of his argument that the district court erred in denying his motion to suppress evidence obtained by the wiretap orders, Brunson relies mainly on *Dahda v. United States*, 138 S. Ct. 1491 (2018), which was decided after the district court ruled. He

argues that *Dahda* essentially overruled the test that the district court applied to uphold the wiretap orders. According to Brunson, *Dahda* recognized that the Wiretap Act must be enforced as written, and therefore a wiretap order that fails to identify the Department of Justice official who had authorized the wiretap application, as required by § 2518(4)(d), is insufficient, and the evidence obtained from the wiretap must be suppressed under § 2518(10)(a)(ii).

The government contends that the district court properly denied Brunson's motion to suppress because the wiretap orders were not facially insufficient, as the authorizing officials "were specifically identified in the wiretap applications that accompanied the orders and were referenced by and incorporated into the orders." The government argues further that *Dahda*, which acknowledges that not all facial defects render an order insufficient, does not hold otherwise.

The Wiretap Act sets forth in detail procedures for the issuance of orders to allow the interception of wire, oral, or electronic communications. To obtain a wiretap order pursuant to the Act, the government must submit an application authorized by an appropriately designated high-level Justice Department official to a judge of competent jurisdiction and state the applicant's authority to make such an application. *See* 18 U.S.C. §§ 2516(1), 2518(1). On the basis of the application, the judge must make certain findings to justify the issuance of the requested order. *See id.* at § 2518(3) (authorizing the entry of an *ex parte* wiretap order if a judge determines, *inter alia*, that there is probable cause that an individual is committing, has committed, or is about to commit an offense and that normal investigative procedures will be unavailing or dangerous). If these requirements

8

are satisfied, the judge may issue an order authorizing the interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting. *See id.* The order must specify:

> (a) the identity of the person, if known, whose communications are to be intercepted;
>
> (b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;
>
> (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;
>
> (d) *the identity* of the agency authorized to intercept the communications, and *of the person authorizing the application*; and
>
> (e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

*Id*. § 2518(4) (emphasis added).

The Wiretap Act also regulates the use of communications intercepted pursuant to a wiretap order. Section 2515 provides that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter." The Act also authorizes "[a]ny aggrieved person in any trial" to "move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that — (i) the communication was unlawfully intercepted; (ii) *the order of authorization or approval under which it was intercepted is insufficient on its face*; or

9

(iii) the interception was not made in conformity with the order of authorization or approval." *Id.* § 2518(10)(a) (emphasis added).

In *Dahda*, the Supreme Court considered wiretap orders that, contrary to the Wiretap Act, included an authorization to intercept communications *outside the territorial jurisdiction* of the issuing court, *i.e.*, the District of Kansas. To address the consequence of the defect, the Court looked to § 2518(10)(a)(ii), which requires suppression when a wiretap order is *facially insufficient*. *See* 138 S. Ct. at 1494. And in determining what makes an order "insufficient," the Court looked to §§ 2518(4)(a)–(e) (which requires specific information, but not the order's territoriality, to be included in an order), but it also noted that insufficiency would not result from "each and every error that appears in an otherwise sufficient order." *Id*. at 1498. The Court concluded that although the orders before it did in fact erroneously state the territorial area where they could lawfully be enforced, that defect did not render the orders facially insufficient. *Id*. at 1499. The territorial scope of the orders was evident from the authorizing judge's territorial jurisdiction — *i.e.*, the District of Kansas — and the presumption in the statute that limited the order's scope to the issuing court's jurisdiction. *Id*. The Court "fail[ed] to see how" the error in describing the territorial scope of the orders "could render the Orders facially insufficient," because the information — the erroneous territorial provision — was "surplus[age]" and was not required. *Id*.

Since the defect at issue did not implicate the requirements stated in §§ 2518(4)(a)–(e), the Court did not address the consequence of a technical defect that might arise by a failure to comply precisely with § 2518(4). *Dahda*, 138 S. Ct. at 1498. Indeed, it stated

10

specifically that it was *not resolving* questions such as the consequence of a defect under § 2518(10)(a)(ii) based on "identifying the wrong Government official as authorizing the application." *Id.* In short, even though the government relied on courts of appeals cases holding that defects arising from a failure to comply to the letter with the requirements of §§ 2518(4)(a)–(e) did not warrant suppression, the Court refused to address the consequence of such technical defects.

Because *Dahda* does not address how we, in this case, are to determine whether the orders' failure to include the names of authorizing officials renders them "insufficient," we must look elsewhere.

B

Brunson's argument that the orders in this case failed adequately to include the "identity . . . of the person authorizing the application" for each order, as required by § 2518(4)(d), arises from the undisputed fact that, even though each order described the authorizing person by title, it did not include *the person's name*, and reference to the name in the application for the order was not an identification on the face of the order. He thus contends that the orders were "insufficient on [their face]," requiring suppression under § 2518(10)(a)(ii) of any evidence derived from the wiretaps.

Each order in this case states that it was issued "pursuant to an application authorized by an appropriate official of the Criminal Division, United States Department of Justice, Deputy Assistant Attorney General, pursuant to the power delegated to that official by special designation of the Attorney General." Thus, while the orders identified

11

the authorizing official by title, they did not include the official's name, instead referring to the application where the name was provided. The question that Brunson thus presents is whether the Wiretap Act requires that orders give the authorizing official's *name*. But his argument addressing that issue reveals that his framing of the issue is in fact incomplete.

Brunson agrees that if the orders stated that the "Attorney General," without naming him or her, authorized the application, the order would be sufficient because that title refers to a unique, identifiable person. At the current time, for example, it is public knowledge, or at least readily obtainable knowledge, that William P. Barr is the Attorney General. Based on this logic, other courts have acknowledged that a name is not necessarily required to provide identification. *See, e.g.*, *United States v. Scurry*, 821 F.3d 1, 8–9 (D.C. Cir. 2016) (holding that the identification requirement of the Wiretap Act is met "where the language points unambiguously to a unique qualified officer holding a position that only one individual can occupy at a time"). Brunson takes a different view, however, when an order identifies a Deputy Assistant Attorney General in the Criminal Division as the authorizing official because there are six persons who hold that title. Thus, he maintains that reference to the "Attorney General," without naming him is sufficient, but reference to a Deputy Assistant Attorney General is not. Brunson's own argument therefore indicates that the issue of whether wiretap orders meet the identity requirement of § 2518(4)(d) rests not on whether the authorizing official is *named*, but rather on whether the authorizing officer is described with such particularity that only one person fits the description.

This recasting of the issue indeed comports more closely to what is required by the text of the Wiretap Act, which employs the word "identity," because that term is defined

12

to mean "the *distinguishing character* or personality of an individual," *Merriam-Webster's Collegiate Dictionary*, 616 (11th ed. 2007) (emphasis added), and not necessarily the name of the individual. Thus, when the statute requires that an order include the "identity" of the person authorizing an action, the word "identity" requires a description of the person that is sufficient to distinguish that person from others, but not necessarily the person's name. In short, whether a wiretap order sufficiently identifies a person turns on whether the description of the person leads to but one person.

By this understanding then, when the order identifies the Attorney General *by title only* as the authorizing official, it is sufficient because the Attorney General refers to one person and his or her name, even though not given, can readily be obtained. With this same reasoning, then, an "identification" by reference in an order to a Criminal Division Deputy Assistant Attorney General would not, without more, be sufficient because there are six such persons, and such identification simply by title would not point to *the one person* who authorized the application.

The information contained in the orders in this case, however, is more complete than a mere reference to one of six Criminal Division Deputy Assistant Attorney Generals. Each order identifies, as the authorizing official, the Deputy Assistant Attorney General of the Criminal Division of the Department of Justice *who signed off on the application* leading to the issuance of the order. And the specific official who authorized the application was readily obtainable from that application, which was submitted to the judge with the proposed order and given to Brunson with the executed order. Thus, both the authorizing judge and Brunson had a description sufficient to readily identify the one official who

13

authorized the application for the order. We therefore conclude that, in context, the orders contained sufficient information to identify the authorizing officials.

Nonetheless, we would commend that, to avoid doubt and possible confusion in the future, prosecutors include as a matter of prudence in wiretap orders both the title and name of the official authorizing the application. And we understand that the Department of Justice has already recognized this. Several years after the orders in this case were issued, the Department sent a circular to all federal prosecutors recommending that the *name* of the authorizing official be included in any proposed wiretap order.

At bottom, however, we conclude that the orders in this case, which identified the officials authorizing the application by title and reference to the application where the official's name was included, were sufficient to satisfy the requirement of § 2518(4)(d).

C

Even were we to assume that perfect compliance with § 2518(4)(d) would entail the inclusion of the authorizing official's name in the text of the order itself, as Brunson argues, we would conclude that the lack of such specificity is a defect that does not amount to an insufficiency. *See Dahda*, 138 S. Ct. at 1497–99 (holding that while "the core concerns test" applied in *United States v. Giordano*, 416 U.S. 505, 527 (1974), to § 2518(10)(a)(i) should not be applied to § 2518(10)(a)(ii) (the provision before us), still "not every defect [in complying with subparagraph (ii)] results in an insufficiency"). While *Dahda* did not undertake to describe the scope of defects that would render wiretap orders insufficient under § 2518(10)(a)(ii), it did cite to cases where technical errors were held not to require

14

suppression under that subparagraph. *See United States v. Moore*, 41 F.3d 370, 375–76 (8th Cir. 1994) (order missing judge's signature); *United States v. Joseph*, 519 F.2d 1068, 1070 (5th Cir. 1975) (order identifying the wrong Government official as authorizing the application); *United States v. Vigi*, 515 F.2d 290, 293 (6th Cir. 1975) (same). Here, the wiretap orders, even if not in perfect compliance, nonetheless *substantially* complied with the requirements of § 2518(4)(a)–(e), as the statute does not specifically require the name of the person authorizing the application. Each application was in fact appropriately approved; each order disclosed by title the authorizing official; and both the court issuing the wiretap orders and later Brunson had actual knowledge of the name of each authorizing official. In these circumstances, the identification in the wiretap orders did not deny Brunson any information required by § 2518(4)(a)–(e). We would therefore conclude that the absence of the official's name from the face of the orders, even if technically a defect, is not the type of defect that would render these orders facially insufficient.

## III

Finally, even if the wiretap orders were thought to be facially insufficient, Brunson's motion to suppress would have appropriately been denied under the good faith doctrine articulated in *United States v. Leon*, 468 U.S. 897 (1984).

In *Leon*, the Supreme Court held that evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective" is not subject to suppression, despite the existence of a constitutional violation. 468 U.S. at 905. The Court noted that the social costs of excluding evidence to vindicate Fourth Amendment rights are

15

high, as the exclusion impedes the truth-finding functions of the judge and jury and possibly results in guilty defendants going free or receiving reduced sentences. *See id.* at 907. And suppressing evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant" has only "marginal or nonexistent" benefits in terms of deterring Fourth Amendment violations. *Id.* at 922. Thus, the Court observed, where an officer acts in good faith, the benefits of suppressing the fruits of an invalid warrant are outweighed by the harms of doing so. *See id.*

While *Leon* carved out an exception to the *judicially created* exclusionary rule and this case involves a *statutory* exclusionary rule, we note that when Congress enacted the Wiretap Act, it did so against the backdrop of analogous Fourth Amendment jurisprudence. Indeed, the accompanying Senate Report specifically states that the statutory suppression remedy was designed to "largely reflect[] existing law." S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2185. Moreover, *Leon*'s rationale is equally applicable in the statutory suppression context — "when law enforcement officers have acted in objective good faith or their transgressions have been minor," requiring suppression of evidence confers an unearned benefit on a guilty defendant that "offends basic concepts of the criminal justice system." *Leon*, 468 U.S. at 908. Moreover, in the same vein, the Supreme Court has specifically recognized that not every defect in a wiretap order justifies exclusion under the Wiretap Act's suppression provision. *See Dahda*, 138 S. Ct. at 1498.

Thus, we conclude that where law enforcement officials have acted reasonably and in good faith to comply with the central substantive requirements of the Wiretap Act, as is

16

the case here, suppression is not justified. *See Moore*, 41 F.3d at 376–77 (holding that the good faith exception applied to the government's interception of communications pursuant to a wiretap order that was missing the judge's signature); *United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006) (per curiam) (unpublished) (holding in the alternative that law enforcement officers "were entitled to rely on facially valid wiretap orders pursuant to the good faith exception"). Even though the wiretap orders submitted by the government did not contain the names of the authorizing officials, the accompanying applications did. More importantly, there was plainly no attempt to obfuscate the identity of the relevant officials, nor did the government fail to secure proper authorization for the applications submitted. And at the time the orders in question were issued in 2013, no court of appeals had held that a failure to include the name of the authorizing officer in the wiretap order rendered such an order substantively deficient. Indeed, numerous courts had considered challenges to similar orders and held that communications intercepted under those orders were *not* subject to suppression. *See, e.g.*, *United States v. Gray*, 521 F.3d 514, 526–28 (6th Cir. 2008) (holding that the omission of the name of the authorizing officer from a wiretap order was a technical defect that did not require suppression); *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005) (same); *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003) (same); *United States v. Radcliff*, 331 F.3d 1153, 1162 (10th Cir. 2003) (same) (noting that "[e]very circuit to consider the question has held that § 2518(10)(a)(ii) does not require suppression if the facial insufficiency of the wiretap order is no more than a technical defect" (quoting *Moore*, 41 F.3d at 374)). Finally, when the D.C. Circuit declined to follow this line of cases, holding in 2016 that the omission of the authorizing

17

officer's name rendered a wiretap order facially insufficient for purposes of § 2518(10)(a)(ii), *see Scurry*, 821 F.3d at 8–12, the Department of Justice changed its practice to ensure that future orders *did* contain the name of the authorizing official.

In short, any defects in orders issued prior to 2016 resulted from good faith efforts to comply with the requirements of the Wiretap Act and not from intentional wrongdoing and therefore would not require suppression of the evidence obtained.

IV

Addressing his sentencing, Brunson contends that the First Step Act, which was enacted on December 21, 2018, during the pendency of this appeal, invalidates the mandatory life sentence imposed by the district court. As he correctly notes, § 401 of the FSA reduced the mandatory term of life imprisonment without release previously required under 21 U.S.C. § 841(b)(1)(A) to a mandatory 25-year term. *See* FSA § 401(a)(2)(A)(ii). But because Brunson was sentenced prior to the FSA's enactment, the benefits of § 401 are not available to him. Section 401(c) of the Act, addressing the section's "Applicability to Pending Cases," provides that § 401 "shall apply to any offense that was committed before the date of enactment of this Act, *if a sentence for the offense has not been imposed as of such date of enactment*." FSA § 401(c) (emphasis added).

Brunson argues that the statutory language should be construed to extend the Act's coverage to "non-final criminal cases pending on direct review at the time of enactment." This reading, however, is contrary to the plain meaning of the statute's text, which on its face restricts applicability to defendants whose sentences had not yet been "*imposed*" at

18

the time of the Act's enactment, and a sentence is "imposed" when it is pronounced by the sentencing court, *i.e.*, the district court. Indeed, we recently recognized as much in *United States v. Jordan*, 952 F.3d 160 (4th Cir. 2020), which held that § 403 of the FSA, which contains the same retroactivity provision as does § 401, did not apply to a defendant whose sentence was pronounced — but not finalized after direct appeal — prior to the FSA's enactment. *See id*. at 172.

As we noted in *Jordan*, this common-sense understanding is consistent with numerous provisions of federal law that govern sentencing in the district court. *See, e.g.*, 18 U.S.C. § 3553(a) (listing "factors to be considered [by the district court] in *imposing* a sentence" emphasis added)); 21 U.S.C. § 851(b) ("If the United States attorney files an information under this section, the court shall after conviction but before pronouncement of sentence . . . inform [the defendant] that any challenge to a prior conviction which is not made before sentence is *imposed* may not thereafter be raised to attack the sentence" (emphasis added)). Unlike district courts, a court of appeals does not "impose" sentences. Its role is limited to affirming or vacating the sentence *imposed* by the district court. *See Jordan*, 952 F.3d at 172 ("[I]mposing sentences is the business of the district courts, while courts of appeals are tasked with reviewing them" (quoting *United States v. Aviles*, 938 F.3d 503, 510 (3d Cir. 2019))).

To support his argument to the contrary, Brunson relies on *United States v. Clark*, 110 F.3d 15, 17 (6th Cir. 1997), where the court held that 18 U.S.C. § 3553(f) (the safety valve statute applying "to all sentences imposed on or after" the date of enactment) applied to cases pending on appeal when the statute was enacted. In reaching this conclusion, the

19

Sixth Circuit reasoned that the safety valve statute should be applied broadly and noted that "[a] case is not yet final when it is pending on appeal. The initial sentence has not been finally 'imposed' within the meaning of the safety valve statute because it is the function of the appellate court to make it final after review or see that the sentence is changed if in error." *Id.* But in *Jordan*, we rejected a request to extend *Clark* to § 403 of the FSA, noting that we could find "no other circuit court decision applying [*Clark*'s] definition of 'imposed' even under the statute at issue in *Clark*, let alone applying it in any other context." *Jordan*, 952 F.3d at 173. In short, we find *Clark*'s reasoning unpersuasive and decline to extend its holding to § 401 of the FSA.

Brunson also argues that a "presumption of retroactivity" requires applying the FSA's amendments to sentences that were not final at the time of enactment, citing *Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 710–12 (1974). But *Bradley* stands only for the proposition that a change in the law may be given effect in pending cases even in the absence of clear legislative intent. *Id.* at 715. Here, in contrast to *Bradley*, Congress *did* expressly provide for retroactive application of the changed law, but it limited that application to defendants whose sentences had not been imposed as of the date the law was enacted.

At bottom, we conclude that the FSA does not provide any benefit to Brunson.

\*     \*     \*

The judgment of the district court is accordingly

AFFIRMED.

20

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The plain language of 18 U.S.C. § 2518(4), as the Supreme Court recognized in *Dahda v. United States*, 138 S. Ct. 1491 (2018), forecloses any holding that the wiretap orders relied on here were facially sufficient.  Accordingly, I must dissent.

I.

A.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510 *et seq.* ("Title III"), has the "dual purpose" of protecting individual privacy and setting forth uniform conditions for law enforcement interception of wire and oral communications.  S. Rep. No. 90-1097, at 66 (1968).  The statute balances the need to combat serious crime and the equally pressing imperative of safeguarding individual privacy from government overreach.  *See id.* at 66–67.  It does so by prohibiting all interstate interceptions of wire, oral, and electronic communications with limited exceptions, such as for law enforcement to investigate specified types of serious crime.  *Cf. United States v. Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987) ("[I]n a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception — not the rule.").

Title III specifies the obligations of both law enforcement and the authorizing court.  It requires law enforcement to submit a detailed wiretap application to a court of competent jurisdiction and delineates the specific information that must be contained in that application.  18 U.S.C. § 2518(1).  Only after a court independently makes the findings

required by the statute can it issue an order authorizing the interception. *Id.* § 2518(3). Title III also separately lists the information that must appear in the court's order. *Id.* § 2518(4). It is the court's order, not the application, that authorizes the interception and provides a defense to civil penalties for unauthorized snooping. *Id.* § 2520(d)(1). An application without a subsequent court order is, legally speaking, no more than a piece of a paper.[1]

B.

An individual may move to suppress evidence obtained via wiretap and any information derived therefrom if: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10).

The Supreme Court has interpreted § 2518(10) on several occasions, most recently in *Dahda v. United States*, 138 S. Ct. 1491 (2018). *See also United States v. Donovan*, 429 U.S. 413 (1977); *United States v. Chavez*, 416 U.S. 562 (1974); *United States v. Giordano*, 416 U.S. 505 (1974). Together, these cases clarify the distinction between an "unlawful[]" wiretap under § 2518(10)(a)(i) and a wiretap authorized by an order that is "insufficient on its face" under § 2518(10)(a)(ii).

As *Giordano* established and *Dahda* reaffirmed, a wiretap is "unlawful[]" within the meaning of subparagraph (i) if the wiretap violates those Title III statutory provisions

---

[1] There is a limited exception, not relevant here, for specific "emergency situation[s]" enumerated by the statute. 18 U.S.C. § 2518(7).

that implement the wiretap-related congressional concerns motivating passage of Title III. *Giordano*, 416 U.S. at 527 ("[W]e think Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.").[2] Following *Giordano*, courts assessing whether a wiretap was "unlawfully intercepted" pursuant to subparagraph (i) look to whether the Department of Justice has substantially complied with Title III's requirements and will suppress the wiretap evidence only if the alleged impropriety implicates those core concerns. This assessment has become known as the "core concerns" test. *Dahda*, 138 S. Ct. at 1498 (referring to the "core concerns test").

For many years, some courts applied *Giordano*'s core concerns test not only to evaluate whether a wiretap was "unlawful[]" under subparagraph (i) but also to determine whether it was "insufficient on its face" under subparagraph (ii). So long as the Department of Justice substantially complied with Title III's core concerns, these courts deemed suppression unwarranted, *even* where the defendant challenged an order as facially insufficient under subparagraph (ii). For example, most courts refused to find wiretap orders "insufficient on [their] face" under subparagraph (ii) where the order failed to name the authorizing official, so long as the wiretap application had in fact been authorized by

_____

[2] A wiretap may also be unlawful under subparagraph (i) if it violates the Constitution, for example where the Government lacks probable cause. *See Giordano*, 416 U.S. at 525–26.

an appropriate official. *See, e.g.*, *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005); *United States v. Radcliff*, 331 F.3d 1153, 1160–63 (10th Cir. 2003); *United States v. Traitz*, 871 F.2d 368, 379 (3d Cir. 1989).[3]

In *Dahda*, the Supreme Court implicitly overruled those cases, holding that *Giordano*'s "core concerns" analysis applies *only* to subparagraph (i), and does *not* apply to the question of whether a wiretap order is "insufficient on its face" under subparagraph (ii). *Dahda*, 138 S. Ct. at 1498 (concluding "that subparagraph (ii) does not contain a *Giordano*-like 'core concerns' requirement").

The *Dahda* Court reasoned that, unlike the assessment of whether a wiretap is unlawful under subparagraph (i), which looks to whether the Government has substantially complied with the statute's objectives, the assessment of whether an order is facially insufficient under subparagraph (ii) is a mechanical test: if the *order* does not contain the information required by § 2518(4), it is facially insufficient:

> It is clear that subparagraph (ii) covers *at least* an *order's* failure to include information that § 2518(4) specifically requires the order to contain. An *order* lacking that information would deviate from the uniform authorizing requirements that Congress explicitly set forth, while also falling literally within the phrase "insufficient on its face."

*Id.* (emphases added) (citations omitted).

---

[3] Reflecting confusion on this issue, prior to *Dahda*, some courts failed to explain whether they refused to suppress pursuant to subparagraph (i) or subparagraph (ii), presumably because they applied the same core concerns test regardless of the statutory basis for suppression. *See, e.g.*, *United States v. Gray*, 521 F.3d 514, 526–28 (6th Cir. 2008); *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003).

24

In sum, when assessing facial sufficiency under subparagraph (ii), *Giordano*'s "core concerns" test is irrelevant. Rather, *Dahda*'s test controls. *Id.* The *Dahda* analysis is simple: when an *order* lacks the information that 2518(4) specifically requires, it must be suppressed as insufficient on its face. *See also United States v. Scurry*, 821 F.3d 1, 8, 13 (D.C. Cir. 2016) (adopting the mechanical test to determine whether an order is facially sufficient).

## II.

Given that § 2518(4)(d) specifically requires that a wiretap order contain the "identity . . . of the person" who authorized the wiretap application, a straightforward application of *Dahda* requires us to hold that failure to provide the "identity of the person" who authorized the application in the orders challenged here is a defect that renders them "insufficient on [their] face" under subparagraph (ii) of § 2518(10)(a). Accordingly, the district court should have suppressed the wiretaps and any "evidence derived therefrom." 18 U.S.C. § 2518(10)(a).

### A.

At oral argument, the Government twice acknowledged that it was the position of the Department of Justice that § 2518(4)(d)'s requirement that an order containing the "identity . . . of the person" means the *name* of the Deputy Assistant Attorney General official who authorized the order, which is precisely what the orders here lacked. Oral Arg. at 19:49–20:41; *see also id.* at 33:21–34:22. I see no reason to construe "identity" to mean anything different.

25

But, despite its concession, the Government claims that omission of the names of the authorizing officials here is without consequence because the orders assertedly incorporate by reference their names from the applications. According to the Government, "an order that does not itself identify the authorizing official by name, but incorporates a wiretap application that *does* name the official, complies with Section 2518(4)(d)." Supp. Br. at 16. The Government maintains that because the orders at issue here cross-reference the wiretap applications, the judge and the defendant could verify that the Department of Justice had complied with Title III's requirements.

There are several problems with this argument. The first is that it is in considerable tension with Title III itself. If incorporation by reference were acceptable, the entire order would need be little more than a single sentence incorporating the application by reference. This would eviscerate Title III, which enumerates in § 2518(1) the precise information required to be contained in an application and separately enumerates in § 2518(4) the precise information required in an order. At bottom, the Government's argument amounts to an assertion that a wiretap application can be a substitute for a wiretap order, an approach that Congress plainly rejected. I cannot accept the Government's unwitting koan that an order can be *facially* sufficient by referring to an *external* document. As the D.C. Circuit explained in factually indistinguishable circumstances:

> Title III's facial sufficiency inquiry is limited to the four corners of the wiretap order. There is something incongruous about an interpretation that would let extrinsic documents transform an order that is "insufficient on its face" into one that is sufficient "on its face." Further, the Government's interpretation would allow it, in every case, to satisfy Title III's *order* identification requirement by satisfying its *application* identification requirement, effectively rendering section 2518(4)(d) superfluous.

26

*Scurry*, 821 F.3d at 9 (citations omitted).

Moreover, the Government's theory rests on the unfounded assumption that the applications and orders necessarily move together. The D.C. Circuit remarked on the problem with the logic in this argument: the "complete overlap" between the information required in the order and application "makes little sense if Congress expected the order always to travel with the application." *Id.* at 10. Moreover, as the Government acknowledged at oral argument, while it aims to keep these documents together, it cannot guarantee that they remain so. When asked if there was a uniform, mandatory method of keeping the wiretap applications and orders together, the Government's answer was "probably not." Oral Arg. at 35:35–36:56. Accordingly, the Government has not and cannot establish that the underlying applications always move with the orders.

In the case at hand, the Government implies that its incorporation by reference theory would cause no harm because these documents traveled together. Supp. Br. at 16– 17 (explaining both the issuing judge and Brunson were provided with the applications, which included the authorizing officials' names). In fact, it is not clear that they did in this case,[4] or that it is uncommon for problems to arise related to accounting for these papers over time. *See Traitz*, 871 F.2d at 376 (noting that draft order was missing a page when it

---

[4] Brunson's *pro se* suppression motion suggests that he did not receive all of the orders at issue in this case, although he implies that he received all the applications. *See* Mot. Suppress 2 ECF No. 1969 (referencing applications, including July 31 application, but noting that he "never received [the July 31st, 2013 order] in discovery materials"); *id.* at 6 ("No order for original interception for target phones #7, #8, #9 from July 31, 2013.").

27

was signed by the district judge).  Thus, I am unable to accept an incorporation by reference argument that is based on the unproven assumption that these documents remain together.

Additionally, despite the Government's argument that specific language in the orders incorporates the applications by reference, I am skeptical that this language clearly does so.  Compare the language in the orders, prepared by the Government, which the Government now asserts incorporates the applications by reference:  "pursuant to an application authorized by an appropriate official" and "full consideration having been given to the matters set forth therein,"; with the explicit incorporation by reference in one of the Government's wiretap applications in this case:  "[o]n the basis of the allegations contained in this application and on the basis of the Affidavit of Special Agent [omitted], *which is fully incorporated herein by reference*." (emphasis added).  As evidenced by the latter example, the Government knows how to clearly incorporate by reference when it intends to do so.  The language in the orders hardly constitutes a clear statement of intent to incorporate the applications by reference.

## B.

Rather than relying on the Government's incorporation by reference theory, the majority offers a theory of its own, one that the Government has expressly disavowed.  Oral Arg. at 33:21–34:48.  The majority's starting point is the Government's asserted belief that an order may identify the Attorney General as the authorizing official by title alone.[5]  According to the majority, this reasoning means that *every* authorizing official can be

_____

[5] I express no view regarding whether an order that identifies the Attorney General by title but not name would be sufficient on its face, as that question is not presented.

28

identified by title rather than by name, so long as the official "is described with such particularity that only one person fits the description." Maj. Op. at 12. Thus, the majority concludes that "whether a wiretap order sufficiently identifies a person turns" not on that person's name, but "on whether the description of the person leads to but one person." *Id.* at 13.

The problem with this argument, as the Government recognizes, is that the title of the authorizing officials other than the Attorney General do not "lead to but one person" — which is why the Government concedes that the most natural understanding of the "identity" in this context means *name*, not title. As the D.C. Circuit explained in rejecting the majority's argument:

> The text is plain and unambiguous; every wiretap court order must identify the individual high-level Justice Department official who . . . authorized the underlying wiretap application. This requirement may be met where the language points unambiguously to a unique qualified officer holding a position that only one individual can occupy at a time, but here there is more than one Deputy Assistant Attorney General and no individual Deputy is identified on the face of [the challenged] wiretap orders. This would appear to end this part of our inquiry.

*Scurry*, 821 F.3d at 8–9.

In sum, the majority's definitional sleight of hand cannot cover up its flawed logic: there simply is *not* enough information on the face of these orders to sufficiently ascertain the "identity" of the specific official at the Department of Justice who authorized the applications. The majority can claim that the orders provided enough of a description to "lead to but one person" only by *reference to the applications*. *See* Maj. Op. at 13 (reasoning that because the orders referred to the official "*who signed off on the*

29

*application*," and "the specific official who authorized the application was readily obtainable from that application," the orders were facially sufficient). In other words, this is but a variation of the Government's incorporation by reference theory. It fails for the same reasons. An order cannot be sufficient *on its face* by reference to an external document.

The other problem with the majority's analysis is its suggestion that the Government's substantial compliance with the core concerns of the statute is relevant to the inquiry concerning whether the orders are sufficient on their face. For example, the majority explains that the wiretap orders were sufficient in part because "the applications were in fact appropriately authorized," *id.* at 3, and the orders were not defective because "[e]ach application was in fact appropriately approved" and "both the court issuing the wiretap orders and later Brunson had actual knowledge of the name of each authorizing official," *id.* at 15. But, as the Government has recognized, the Supreme Court in *Dahda* explicitly *rejected* an approach that assesses facial sufficiency by reference to whether the Government has substantially complied with Title III; instead, *Dahda* directs courts to determine whether, on its face, a wiretap order contains the information required by § 2518(4). *See Dahda*, 138 S. Ct. at 1498.[6]

*Dahda*'s explicit disavowal of the core concerns test in determining facial sufficiency under subparagraph (ii) was no anomaly. It has been the Supreme Court's

---

[6] The Government conceded at oral argument that, after *Dahda*, "substantial compliance" could not cure a facially insufficient warrant, as *Dahda* explicitly rejected applying a "core concerns" test in the context of 2518(10)(a)(ii). Oral Arg. at 23:30–23:50.

consistent position for more than forty years that each of the three subparagraphs requiring suppression under § 2518(10)(a) must be given independent effect. *See Dahda*, 138 S. Ct. at 1498 ("The underlying point of *Giordano*'s limitation was to help give independent meaning to each of § 2518(10)(a)'s subparagraphs. It thus makes little sense to extend the core concerns test to subparagraph (ii) . . . ."); *Giordano*, 416 U.S. at 527 ("[I]t does appear that paragraphs (ii) and (iii) must be deemed to provide suppression for failure to observe some statutory requirements that would not render interceptions unlawful under paragraph (i)."). *Dahda*'s embrace of a mechanical test when assessing facial sufficiency under subparagraph (ii) is necessary to give independent meaning to each of § 2518(10)(a)'s three bases for suppression. In stating that the orders here are facially sufficient in part because they were in fact appropriately authorized, the majority has conflated errors under subparagraph (i) with errors under subparagraph (ii).[7] Consequently, the majority's analysis will sow unnecessary confusion among district courts and litigants alike.

---

[7] Resisting the conclusion that *Dahda* resolves this case, the majority maintains that the failure of the orders to contain the names of the authorizing officers is merely a technical defect, and *Dahda* "did not address the consequence of a technical defect that might arise by a failure to comply precisely with § 2518(4)." Maj. Op. at 10. *Dahda* did leave open the question of how broadly lower courts should construe the class of errors that result in facial insufficiency. 138 S. Ct. at 1498. But the error here is squarely controlled by the *Dahda* Court's explicit reasoning. *See id.* ("It is clear that subparagraph (ii) covers *at least* an order's failure to include information that § 2518(4) specifically requires the order to contain." (emphasis added)). The Court's unambiguous language thus forecloses the argument that the kind of error here — the omission of the identity of the authorizing official, which is one of the pieces of information that § 2518(4) requires — can ever result in a facially sufficient order. In short, the majority's supposition that *this* type of error was unresolved in *Dahda* is baseless.

31

III.

Perhaps recognizing the logical contortions required of its holding, the majority (in what is plainly dicta) also adopts the Government's alternative argument that we should apply the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984). Invocation of *Leon* in the Title III context is misguided. The exception is relevant in cases of *constitutional* suppression; it is a judicially created exception to a judicially created remedy to protect a constitutional right. *See id.* at 906. This, however, is not a constitutional case; the statute controls, and the statute does not provide a good faith exception. *Cf. Giordano*, 416 U.S. at 524 ("The issue [of suppression] does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III . . . ."). Rather, the statute directs a court to suppress orders that are "insufficient on [their] face." 18 U.S.C. § 2518(10)(a)(ii). Accordingly, as the Government itself acknowledged at oral argument, the Supreme Court has never imported the good faith exception into Title III. Oral Arg. at 28:26–28:34.

In opining to the contrary, the majority relies in part on its observation that, with respect to Title III, Congress legislated "against the backdrop of analogous Fourth Amendment jurisprudence" and that Congress intended the suppression remedy to "largely reflect[] existing law." Maj. Op. at 16. This is uncontroversial — as far as it goes. But Congress enacted Title III almost twenty years *before* the Supreme Court issued *Leon*. Thus, in so legislating, Congress could hardly have intended Title III to reflect the *Leon* rule that did not yet exist. *See United States v. Rice*, 478 F.3d 704, 713 (6th Cir. 2007)

32

("Congress obviously could not know that Fourth Amendment search and seizure law would embrace a good-faith exception sixteen years after the passage of Title III, and the language from the Senate Report indicates a desire to incorporate only the search and seizure law that was in place at the time of the passage of Title III."). Nor has Congress subsequently amended Title III to provide for such an exception.

The majority also leans on *Leon*'s policy rationales to support its conclusion that we should import *Leon* into the Title III context. The majority believes it is unfair to law enforcement to "confer[] an unearned benefit on a guilty defendant" for a mistake made in good faith. Maj. Op. at 16. Importing this reasoning is into Title III is a fundamentally flawed exercise. Whether to "confer[]" such a "benefit" is not a choice that we are free to make. The decision whether to suppress evidence, and in what circumstances, constitute policy judgments already expressly made by Congress. We do not have the authority to disregard those judgments. *See Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 608 (4th Cir. 2010) (Niemeyer, J.) ("The judiciary, however, should not insert itself in these policy matters by questioning or debating legislative judgments, as it is constituted only to comprehend, interpret, and apply what Congress has duly provided.").

IV.

The Government's last refuge, an argument that the majority does not adopt, is that, if suppression is warranted and the good-faith exception does not apply, any error was harmless because of the "overwhelming, independent" non-wiretap evidence against

33

Brunson. Supp. Br. at 9. Assuming harmless error applies,[8] however, examination of the trial record renders laughable the Government's contention that "the intercepted wire communications were a small part of the [G]overnment's overall case." Supp. Br. at 22.

In fact, the record reveals that the intercepted calls were unquestionably the linchpin of the Government's case. The calls were repeatedly played for the jury and were discussed throughout the trial by the Government and its witnesses (including Greenan, Wright, Ravenel, Gates, and Davis). *See, e.g.*, JA 88–91 (FBI agent testifying about contents of wiretaps), 94–95 (same); JA 96 (intercepted wiretap audio recording played for the jury), 97 (same), 99 (same), 102 (same), 233 (same), 234 (same), 248 (same), 256 (same), 259 (same), 262 (same), 264 (same), 266 (same), 270 (same), 271 (same), 273 (same), 280 (same), 284 (same), 285 (same), 288 (same), 290 (same), 291 (same), 406 (same), 427 (same), 467 (same), 511 (same). Given the Government's repeated use of and reference to

---

[8] Some out-of-circuit precedent suggests harmless error applies in the Title III context. *See, e.g.*, *United States v. Quintero*, 38 F.3d 1317, 1331 (3d Cir. 1994). We have previously declined to apply harmless error to a Title III case but have never squarely determined whether it would be appropriate to do so. *See United States v. Crabtree*, 565 F.3d 887, 892 (4th Cir. 2009). However, the conclusion that a harmless error analysis is appropriate is neither obvious nor compelled by controlling authority. Federal Rule of Criminal Procedure 52(a) generally requires courts to apply harmless error to all trial errors. *See Neder v. United States*, 527 U.S. 1, 7 (1999). *See generally Kotteakos v. United States*, 328 U.S. 750, 760–65 (1946). But Rule 52(a) is a congressional command that can be overridden by statute. In *Zedner v. United States*, 547 U.S. 489 (2006), the Court rejected the Government's argument that harmless error applied in the Speedy Trial Act context. *Id.* at 507–09. The critical test, according to the Court, was Congress's intent, shown in part through that statute's "detailed requirements . . . regulating ends-of-justice continuances." *Id.* at 508. Of course, the Speedy Trial Act is not Title III. I assume harmless error applies here, as Brunson appears to have conceded the point, but I note that, following *Zedner*, there is at least a colorable argument as to whether harmless error has been displaced by Title III's detailed requirements governing suppression.

these tapes throughout the trial, it is impossible to conclude that discussing and playing these incriminating audio recordings did not substantially influence the jury's view of Brunson's culpability. This certainly is sufficient to conclude that the error was not harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946) ("The inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.").

## V.

For the foregoing reasons, I respectfully dissent.[9]

---

[9] Because I believe Brunson's conviction should ultimately be vacated on the count related to his First Step Act motion, I do not address that claim.